186 P.3d 1117 (2008)
Perla SALDIVAR and Albert Saldivar, Harish Bharti, Appellants,
v.
Dennis MOMAH, Jane Doe Momah, and the marital community composed thereof, U.S. Healthworks Medical Group of Washington, P.S., a Washington professional services company, Charles Momah, Jane Doe Momah, and the marital community composed thereof and Does 1-10, Respondents.
No. 34891-8-II.
Court of Appeals of Washington, Division 2.
June 24, 2008.
*1122 Howard Mark Goodfriend, Catherine Wright Smith, Edwards Sieh Smith & Goodfriend PS, Seattle, WA, Marja M. Starczewski, Law Office of Marja Starczewski, PLLC, East Wenatchee, WA, for Appellant.
Tyna Ek, Nancy Katherine McCoid, Soha & Lang PS, Mary H. Spillane, Daniel W. Ferm, Williams Kastner & Gibbs PLLC, Heath Sharpless Fox, Johnson Graffe Keay Moniz & Wick LLP, Vanessa Vanderbrug, John Cornelius Versnel III, Lawrence & Versnel PLLC, Seattle, WA, for Respondent.
Emily Lieberman, Attorney at Law, Molly Anne Lawrence, GordonDerr LLP, Kelly O'Connell, Catherine A. Carroll, Sexual Violence Law Center, Seattle, WA, Amicus Curiae on behalf of Nw Women's Law Center & WA Coalition of Sexual Assault Programs.
Paul Nicholas Luvera Jr., J. Andrew Hoyal II, Luvera Barnett Brindley Beninger et al, Seattle, WA, Amicus Curiae on behalf of Luvera Law Firm.
QUINN-BRINTNALL, J.
¶ 1 Following a bench trial, Perla and Albert Saldivar appeal the trial court's dismissal of their case against Dennis Momah, Charles Momah, and U.S. Healthworks for damages caused by alleged sexual abuse as well as the trial court's ruling in favor of Dennis's[1] counterclaims. The Saldivars argue: (1) they are immune from liability under RCW 4.24.510, (2) the trial court erred when it denied them a jury trial, (3) the trial court erred when it found them liable for abuse of process, and (4) the trial court erred when it excluded certain evidence. In addition, the Saldivars' attorney, Harish Bharti, appeals the trial court's imposition of sanctions against him. We affirm in part and reverse in part.

FACTS
BACKGROUND
¶ 2 In May 2003, Perla went to U.S. Healthworks' clinic in Puyallup for diagnosis, treatment, and physical therapy for a work-related back injury.[2] According to clinic records, Dennis treated Perla on May 27 and June 26, 2003.
MEDICAL QUALITY ASSURANCE COMMISSION COMPLAINT
¶ 3 In October 2003, the Saldivars sent a letter to the Medical Quality Assurance Commission (MQAC), a division of the Department of Health, alleging that "Dr. Dennis Momah" had seen her on May 27, June 19, and June 26, and that he had "touched [her] improperly" on the "buttocks" on "two occasions without [her] consent and with the excuse that he needed to check [her] injuries." Ex. 8, 19. Perla also reported that Dennis was quite brusque with her when he "grabbed" a referral form from her hand during her last appointment. Ex 19. Perla further stated that Dennis had given her medication that he refused to identify, stating only that it was for "severe pain." Ex. 19. Perla also claimed that when she asked for a referral to another doctor, Dennis became angry and left the room for approximately 25 minutes. The letter did not allege that two different look-alike doctors treated Perla or that Dennis had touched her vagina. *1123 A MQAC investigator advised the Saldivars that Dennis's alleged sexual abuse constituted a crime. Nevertheless, MQAC closed the file on the original complaint, finding "no cause for action." Clerk's Papers (CP) at 626.
POLICE REPORT
¶ 4 After MQAC closed the file on the Saldivars' complaint, they retained Bharti as their attorney. Perla then filed a declaration and complaint with the Federal Way Police Department, alleging for the first time that Dennis "sexually assaulted [her] by unnecessarily putting his hand in [her] vagina." Ex. 20. Perla testified that Bharti helped her prepare the declaration. Perla also alleged for the first time that she believed two different doctors treated her during one of her visits to U.S. Healthworks. Specifically, Perla alleged that the first doctor was wearing brown shoes, while the second doctor had an "orthopedic shoe on one foot, which was black with velcro." [3] Ex. 20. Perla stated that she was "certain [she] saw two different persons who looked alike" during her examination. Ex. 20. The Federal Way Police Department took no action on the Saldivars' complaint.
COMPLAINT
¶ 5 On April 5, 2004, the Saldivars sued Dennis and U.S. Healthworks for negligence, lack of informed consent, breach of fiduciary duty, violation of the Consumer Protection Act, ch. 19.86 RCW, and outrage. The complaint alleged that Perla had been seen by Dennis three times[4] and that during two of those visits he had "placed his hands on and in" Perla's vagina and on the third visit he "began touching [her] buttocks." CP at 9-10. The complaint also alleged that on "at least one" occasion, Perla was seen by two different physicians who looked "mostly alike." CP at 11. For the first time, Perla mentioned that the two doctors' "weight appeared different," but repeated her previous allegation that the second doctor wore an orthopedic shoe. CP at 11. Her complaint also stated that the second doctor was unable to remember her condition or which medications she was allergic to, even though she had discussed her condition and allergies with the (first) doctor. The complaint further alleged that during Perla's last visit, she was concerned that Dennis would conduct "another vaginal examination," and that she requested a nurse be present during the examination. CP at 10. Despite her request, Perla acquiesced to the examination without a nurse because "Dennis Momah" raised his voice at her and she wanted to believe that he was "sincere and treating her appropriately." CP at 10. The complaint further alleged that during the examination, he began "touching [her] buttocks," prompting her to refuse further treatment. CP at 10.
¶ 6 Next, the complaint alleged U.S. Healthworks was negligent in their medical care of Perla because it failed to obtain her informed consent and acted in an improper and unethical manner. U.S. Healthworks moved for summary judgment on these issues and the trial court granted its motion. The only remaining claim against U.S. Healthworks was for negligence for failing to have a female present in the examination room, and in failing to provide Perla with a different doctor. The Saldivars do not raise any issues On appeal regarding the trial court's dismissal of U.S. Healthworks.
¶ 7 In his answer, Dennis counterclaimed, alleging intentional infliction of emotional distress (outrage), negligent infliction of emotional distress, and abuse of process. Specifically, Dennis claimed that the Saldivars' complaint in the instant case, as well as their complaint to the MQAC and the Federal Way police, were "without good cause and for [the] improper motive[ ]," of "obtain[ing] money" from him under "false pretenses." CP at 32.
INTERROGATORIES
¶ 8 On July 6, 2004, Perla answered interrogatories in which she stated for the first *1124 time that she had seen Dennis on four occasions, not three.[5] Perla repeated her allegations about impersonation and sexual abuse.
PERLA'S DEPOSITION
¶ 9 During a deposition on September 7, 2004, Perla repeated her allegations of impersonation and sexual abuse. For the first time, Perla stated that she knew "right away" that the second doctor was a different person. CP at 628. Perla also stated for the first time that Dennis "didn't touch [her]" on the June 26 visit. CP at 629.
AMENDED COMPLAINT
¶ 10 On September 15, 2004, King County charged Charles, Dennis's twin brother, with raping or taking indecent liberties with four of his patients and with insurance fraud. On September 30, 2004, the Saldivars moved to amend their complaint to add Charles as a defendant. The Saldivars supported the motion with a new declaration in which Perla stated for the first time that (1) she learned at Dennis's deposition that Charles is Dennis's twin brother; (2) the second doctor's accent and manner of speech differed from the first doctor; (3) the second doctor had a scar on his face,[6] while the first did not; (4) after seeing a KOMO 4 News report about Charles's arraignment, hearing his manner of speech, and noticing the scar on his face, Perla believed "that [she] was treated by two different physicians, Charles Momah and Dennis Momah," while she was at Dennis's Puyallup clinic; and (5) it was Charles, not Dennis, who sexually assaulted her during two of her visits to Dennis's office. CP at 66.
¶ 11 The proposed amended complaint alleged that either Charles or Dennis had put "his hands on and in" Perla's vagina during two visits, but the Saldivars dropped allegations as to specific dates. CP at 43. The proposed amended complaint repeated Perla's allegations regarding the June 26 visit, but stated for the first time that Perla was touched "inappropriately" during her "last" visit, rather than on the buttocks or the vagina. CP at 44. The trial court granted the Saldivars' motion to amend the complaint.
ALBERT'S DEPOSITION
¶ 12 On June 13, 2005, the defense deposed Albert, Perla's husband. He stated that the lawsuit was "not about the money issue," but was about making sure that "these people don't practice medicine again." CP at 810. Albert testified that he went to the Puyallup clinic only once, on Perla's third visit, and waited in the car. Then, in contrast, he stated that during Perla's "third and final visit" he waited outside her exam room and "heard her tell the young girl" that she wanted a different doctor to treat her. 2 Report of Proceedings (RP) at 180. Albert also stated that he saw Dennis in the clinic lobby on Perla's second visit. Lastly, Albert testified by deposition that he learned about Charles from Bharti in September or October, 2003.
¶ 13 At trial, Albert testified that he first learned of Charles from the newspapers, not from Bharti. In contrast to his deposition, he testified that he had gone with Perla to the Puyallup clinic only once, but sat outside, and had never been in an examination room, or even the building, when "Dr. Momah" was treating Perla. When confronted with this inconsistency, Albert stated that he must have seen Dennis when he went inside to get a glass of water and that he actually went inside the clinic several times.
SECOND AMENDED COMPLAINT
¶ 14 On June 17, 2005, the trial court allowed the Saldivars to amend their complaint again to add new negligence claims against U.S. Healthworks. The second amended complaint repeated the first amended complaint's allegation that Dennis or Charles put his "hands on and in [Perla's] vagina," and alleged Perla had been touched "inappropriately" by Dennis or Charles during her last visit to the clinic. CP at 380-81.
*1125 JURY TRIAL
¶ 15 When the Saldivars filed this suit, they filed, but failed to serve, a jury demand on the Momah brothers or U.S. Healthworks. The clerk issued an order setting the case schedule, which established an October 11, 2004 deadline for demanding a jury, and an October 3, 2005 trial date. In May 2005, Charles moved for a continuance of the trial date because his King County criminal charges were scheduled to start the same day. On September 1, 2005, 11 months after the jury demand deadline had passed, the Momah brothers moved to strike the Saldivars' jury demand. The trial court granted the motion to strike and granted Charles's motion to continue the trial date, setting a new date of May 2, 2006.
VIDEO TAPE RECORDING PRESERVATION DEPOSITION OF CHARLES
¶ 16 In November 2005, Charles was convicted in King County of rape and indecent liberties and sentenced to 20 years in prison.[7] On March 31, 2006, the trial court denied the Saldivars' motion to continue the trial but allowed both parties to take a video tape recording preservation deposition of Charles for use in the civil trial, since he was incarcerated and would not be transported to participate in a civil case. The trial court also dismissed all claims against U.S. Healthworks except for claims of negligence for failing to prevent Dennis from seeing Perla following Albert's complaint and for failing to provide Perla with a chaperone during her examinations. The trial court also ordered MQAC to provide all materials it received from the Saldivars or their counsel.[8]
PRE-TRIAL BRIEF
¶ 17 A week before trial, on April 28, 2006, the Saldivars filed a trial brief, in which they asserted that "it was Charles Momah who sexually assaulted [Perla] on [May 27] and on June 26, 2003." CP at 600.
TRIAL
¶ 18 At trial, Perla testified that she saw "Dr. Momah" on three occasions: once on May 27 or 28, once in mid-June, and once at the end of June. Other than Perla's testimony, there is no record of a visit to Dennis's Puyallup clinic in mid-June. Perla testified that during the first appointment, Charles, pretending to be Dennis, sexually assaulted her. She testified that "Dr. Momah" asked her to bend forward and backward while he held her from behind and slid his hand inside the band of her elastic sweatpants and she "felt his hand inside [her] vagina." 2 RP at 214-15. Perla testified that she became uncomfortable and requested a nurse, at which time "Dr. Momah" left the room. Perla further testified that he left her alone in the exam room for 20 to 45 minutes, and that she opened the door twice and asked passing nurses when the doctor would return.
¶ 19 Upon "Dr. Momah's" return, Perla testified that he looked different and acted differently. Perla reiterated her previous description of the shoe, accent, and his inability to remember her name or ailment. For the first time, Perla stated that Dennis's "hands were very chubby . . . and he had . . . scars in the hand" while Charles did not, the men had different hairlines, were not the same height, and that Dennis carried his weight in his stomach while Charles carried his weight in his upper body. 2 RP at 260. Perla testified that, after she returned home, she informed her husband, father, and friend, Nancy Wiesniewski, of the incident.[9] Perla testified that neither she nor Albert informed *1126 U.S. Healthworks of the alleged sexual abuse because she was "afraid and embarrassed." 3 RP at 410. During her testimony, Perla identified Dennis as the man who sexually abused her on May 28, 2003.
¶ 20 After Perla described the differences between the Momah brothers, she explained that she was able to identify Charles as her abuser because "today I saw the video." 2 RP at 262. Defense lawyers denied having seen any video tape recording depositions, and Bharti explained that Perla was referring to a deposition of Charles in another case and admitted that he had just received the recording and had shown it to Perla during the court lunch recess that day. A King County protective order prohibited the contents of that deposition from being shown to anyone other than the "attorneys, witnesses and support staff involved in [the King County] case" and further stated that it could not be "disseminated further until further order of the [King County] court." CP at 1487 (emphasis added). The trial court found that Bharti impermissibly tainted Perla's testimony describing the differences between the two doctors because he showed her a video tape recording of Charles that had been made for a separate criminal case.
¶ 21 Perla further testified that, during the mid-June visit, "Dr. Momah" asked her to change into a gown and lie down, at which time Perla asked for a nurse to be present. Contrary to her deposition, Perla testified that Dennis stood behind her, asked her to lie on her side and bring her knees to her chest, and touched her vagina. Perla then testified that she told Dennis she did not want him to examine her without a nurse present and he left the room.
¶ 22 Next, Perla testified that after she got dressed, Ed Fuentes, an interpreter scheduled to assist in the examination, knocked on the door.[10] At trial, Fuentes admitted that, although he had previously advised defense counsel that he was not present during any of Perla's medical appointments, he now remembered that he had, in fact, attended one visit.
¶ 23 Perla further testified there was a third and final visit where she saw "Dr. Momah" in order to have him sign a transfer for her to see another doctor, but that he did not examine her. Although Perla testified that Dennis did not examine her during her June 26 visit, there are extensive notes in her file regarding her examination that day.
¶ 24 Perla also testified that she had no contact with MQAC following her initial complaint in 2003. Defense counsel presented a declaration that Perla had signed, dated January 29, 2005, and a written summary of an interview that Perla had given on February 6, 2006. Contrary to her testimony, Perla had, in fact, contacted MQAC after her initial complaint and, following her second complaint, MQAC opened a new case file regarding Dennis. During the second MQAC interview, Perla testified that she had three appointments with Dennis and that during the first appointment he slid her sweatpants down, put his hand between her buttocks, and slid his finger into her rectum. Perla then stated Dennis left the room and an imposter, who was shorter and wore a different shirt and shoes, entered the room. Regarding her second and third visits, Perla described arguments with "Dr. Momah," but no offensive or inappropriate touching of the buttocks, vagina, or rectum.
¶ 25 The Saldivars called Dennis to the stand where he testified that he had not impersonated Charles, denied that Charles impersonated him, denied that he had ever inappropriately or sexually touched Perla, and reiterated that he had only seen her on two occasions, May 28 and June 26, not June 19, 2003.
EVIDENTIARY RULINGS
¶ 26 The Saldivars sought to have Professor Karil Klingbeil, MSW, the former Director of Social Work and founder of Harborview Medical Center's Sexual Assault Center, testify that Perla suffered from post-traumatic stress disorder (PTSD) and describe the effects of PTSD. The trial court excluded Klingbeil's testimony on the grounds that "[a]s a social worker[,] Ms. Klingbeil is not *1127 qualified to opine on psychiatric conditions." CP at 408.
¶ 27 The Saldivars also sought to have numerous lay witnesses testify in support of their claim that Dennis allowed his brother Charles to impersonate him. These witnesses claimed that Dennis had impersonated Charles at Charles's clinic in King County. In addition, the Saldivars argued that the witnesses were relevant to Dennis's claim that his economic damages and emotional distress were caused by Perla's allegations against him. The trial court excluded these witnesses on the grounds that they did not "have experience at the Puyallup Clinic of U.S. Healthworks during [a] similar time period" as Perla's allegations. CP at 410.
¶ 28 Dennis's counsel offered the MQAC investigator's summary of Perla's February 2006 interview. One of the Saldivars' attorneys objected that the document "contain[ed] hearsay." 3 RP at 421. The trial court noted that the document contradicted Perla's trial court testimony that she had not had any contact with MQAC since 2003, and admitted the document into evidence. Perla then testified that Bharti had helped her with her most recent MQAC complaint. The trial court found that the MQAC materials showed that Perla and the Saldivars' attorneys[11] had not been truthful when they repeatedly told the court that the MQAC investigation of Dennis that was opened in 2003 and closed in 2004 had been "reopened," but that the Saldivars were not responsible for the "reopening."
¶ 29 The Saldivars also sought to introduce a video tape recording of a KOMO TV newscast. Perla claimed that, after seeing the newscast, she recognized Charles as the doctor who sexually abused her on May 27. The trial excluded that video tape recording, as well as all other photographs or video tape recordings of Charles or Dennis, because the Saldivars failed to present foundation testimony from the person who took the photographs or video tape recording.
¶ 30 After the Saldivars rested, the Momah brothers and U.S. Healthworks moved to dismiss the Saldivars' claims, and Dennis moved for a directed verdict of liability on his counterclaims. During oral argument on the motion, the Saldivars asserted for the first time that RCW 4.24.510[12] immunized them from liability to Dennis. The trial court granted the defendants' motion to dismiss, but declined to grant Dennis's motion for a directed verdict of liability on his counterclaims. The trial court also stated that it would entertain CR 11 sanctions against Bharti at the close of the case.
¶ 31 The trial court granted the motion to dismiss because it found that Perla's testimony was not credible for several reasons. First, the trial court noted that Perla "was as outraged by [Dr. Momah's brusque] treatment of her as she was by the apparent alleged sexual assault." 5 RP at 705. Second, the trial court found that Perla's testimony was inconsistent and that "she has made too many sworn statements to too many people with too many variations for this court to know what to believe." 5 RP at 705. Third, the trial court found that Perla's testimony was impermissibly tainted because Bharti showed her a video tape recording of Charles during the lunch hour of her testimony, shortly before she described the differences between the two brothers to the court. Lastly, the trial court found that Perla lied on the stand when she stated that she had "absolutely no contact with [MQAC]" after 2003, when she had "filed a new complaint *1128 . . . with the assistance of her attorneys who . . . assured [the trial court that] they had no knowledge of and had never participated in preparing that additional complaint." 5 RP at 706.
DENNIS'S COUNTERCLAIMS
¶ 32 Most of the evidence in support of Dennis's counterclaims was elicited during the Saldivars' case-in-chief, but after the Saldivars' claims were dismissed, the defense recalled Dennis to testify briefly in support of his counterclaims.[13] Dennis testified that he lost his job at U.S. Healthworks because of the complaints that began with Perla's letter to MQAC. Furthermore, Dennis testified that he had a stroke in June 2004 because of the stress the Saldivars' accusations caused. Although MQAC notified Dennis in April 2004 that it was not going to take any action on Perla's complaint or on those of other Bharti clients, Dennis testified that he could not afford to renew his medical license and it lapsed in 2005. Dennis further testified that he was uninsurable and unemployable as a result of the allegations. The trial court issued an oral ruling in Dennis's favor, awarding him more than $2.8 million in damages, as well as attorney fees under the "frivolous lawsuit" statute. 5 RP at 778. The Saldivars timely appealed.
CR 11 SANCTIONS
¶ 33 On May 18, 2006, Dennis, Charles, and U.S. Healthworks moved for sanctions against Bharti, under CR 11 and the trial court's inherent power to control proceedings before it. Dennis's attorney provided the trial court with copies of materials about Dennis on Bharti's website, as well as information about Bharti's practice of bringing, and then dismissing, claims against Dennis in complaints about Charles, without serving them on Dennis. Dennis also introduced evidence that Bharti induced a witness to sign a false declaration and an instance in another case in which he made allegations on behalf of a client that the client later disavowed under oath. Dennis's counsel also informed the trial court that Bharti served Dennis with a complaint in another "impersonation" case in the courthouse parking lot during trial, and that King County had sanctioned him for making baseless accusations and not conducting a reasonable pre-filing inquiry. Bharti complained that the trial court gave him only four days to respond, but he did not request a continuance or indicate what he would have accomplished with more time.
¶ 34 On May 24, 2006, the trial court entered its findings of fact, conclusions of law, and an order sanctioning Bharti. The judgment awarded damages of $2,819,037, and attorney fees and costs of $144,205.88 to Dennis, $108,340.29 to U.S. Healthworks, and $715 to Charles. The Saldivars moved for a new trial or reconsideration of the findings and conclusions. The trial court denied the motion.
¶ 35 The trial court ordered Bharti to pay Dennis's, U.S. Healthworks', and Charles's attorney fees and costs. The court also required Bharti to pay Dennis an additional $250,000 as well as $50,000 to the registry of the court. Finally, the trial court required Bharti to post the trial court's findings of fact and conclusions of law on his website with the same prominence given to other links within two days of the order, and to keep it there for as long as his website referenced the Momah brothers, or for a minimum of one year.
¶ 36 The trial court concluded that Bharti was "an active and knowing participant in the fabrication of Perla Saldivar's ever changing accusations," and that he signed both the initial and amended complaint and responses to interrogatories without a reasonable belief that they were true and well grounded in fact. CP at 1530. The trial court also found that Bharti filed "irrelevant and salacious declarations . . . for the improper purpose of eliciting media/public attention, to harass and damage the reputation of Dr. Momah, and to . . . gain advantage in other litigation." CP at 1530-31. Lastly, the trial court found that Bharti violated a King County protective order and affirmatively lied to the court.
¶ 37 Bharti notified the trial court that he could not modify his website until his webmaster returned from vacation the following *1129 week, and took the website down entirely on May 26, 2006. When the website was back up, it contained the court's findings, as well as other pleadings from the Saldivars' case.
¶ 38 Bharti posted a cash bond and properly filed a motion for a stay with this court on June 2, 2006, which we granted as to the monetary sanctions only. On June 23, 2006, the trial court ordered Bharti to appear and show cause why he should not be found in contempt for failing to pay the non-compensatory sanctions and for failing to prominently post the court's findings on his website by May 26, 2006. Bharti timely appealed the trial court's sanction order, judgment, and order to show cause.

ANALYSIS
ABSOLUTE IMMUNITY UNDER RCW 4.24.510
¶ 39 The Saldivars argue that we should reverse the trial court's judgment in favor of Dennis for abuse of process and outrage because Dennis's counterclaims arise from the Saldivars' privileged complaints to MQAC and, thus, RCW 4.24.510 immunizes the Saldivars from liability. While RCW 4.24.510 protects the Saldivars from liability arising from actions taken by MQAC or police in response to their complaints, it is not applicable to private lawsuits for private relief; the Saldivars are not immune from liability for that portion of the judgment related to the filing of the lawsuit.
¶ 40 Under RCW 4.24.510:
A person who communicates a complaint or information to any branch or agency of federal, state, or local government . . . is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization. A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall receive statutory damages of ten thousand dollars. Statutory damages may be denied if the court finds that the complaint or information was communicated in bad faith.
¶ 41 The purpose of RCW 4.24.510 is to "help protect people who make complaints to [the] government from civil suits regarding those complaints." SUBSTITUTE H.B. 2699, 57th Leg., Reg. Sess. (Wash.2002). The immunity under the statute is with respect to "communications to a public officer who is authorized to act on the communication." Skimming v. Boxer, 119 Wash.App. 748, 758, 82 P.3d 707 (citing Right-Price Recreation, LLC v. Connells Prairie Cmty. Council, 146 Wash.2d 370, 382, 46 P.3d 789 (2002), cert. denied sub. nom. Gain v. Washington, 540 U.S. 1149, 124 S.Ct. 1147, 157 L.Ed.2d 1043 (2004)), review denied, 152 Wash.2d 1016, 101 P.3d 108 (2004). A plaintiff who brings a private lawsuit for private relief is not seeking official governmental action, but rather redress from the court. See Reid v. Dalton, 124 Wash.App. 113, 126, 100 P.3d 349 (2004) (litigation that does not involve a bona fide grievance does not fall under anti-SLAPP[14] statutes) (citing Bill Johnson's Rests., Inc. v. Nat'l Labor Relations Bd., 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983)), review denied, 155 Wash.2d 1005, 120 P.3d 578 (2005). Here, although RCW 4.24.510 covers Perla's complaint to the MQAC and the police, once the Saldivars became private plaintiffs seeking private relief, they ceased to be among the class of persons who can claim protection from liability under RCW 4.24.510.
ABUSE OF PROCESS
¶ 42 The Saldivars argue that Dennis's abuse of process claim must fail because their purpose in bringing the suit, "making sure that Dr. Dennis Momah would never be permitted to practice," is not an improper purpose in a suit alleging sexual abuse by a medical professional. Br. of Appellant (Saldivar) at 27-28. Dennis argues that the Saldivars not only instituted the proceedings for the improper purpose of preventing Dennis from practicing medicine, but served process upon Charles, making him Dennis's co-defendant, in order to harass Dennis, prejudice the finder of fact against Dennis, and make the *1130 litigation more expensive for Dennis. Because Dennis is unable to show improper purpose, we reverse the judgment for abuse of process.
¶ 43 Abuse of process is the misuse or misapplication of the process, after the initiation of the legal proceeding, for an end other than that which the process was designed to accomplish. Loeffelholz v. Citizens for Leaders With Ethics & Accountability Now (C.L.E.A.N.), 119 Wash.App. 665, 699-700, 82 P.3d 1199 (trial court properly dismissed an abuse of process counterclaim because plaintiff failed to present evidence of any improper actions following the issuance of process), review denied, 152 Wash.2d 1023, 101 P.3d 107 (2004). To prove the tort of abuse of process, the party must show both "(1) the existence of an ulterior purpose to accomplish an object not within the proper scope of the process, and (2) an act in the use of legal process not proper in the regular prosecution of the proceedings." Mark v. Williams, 45 Wash.App. 182, 191, 724 P.2d 428, review denied, 107 Wash.2d 1015 (1986). But the "mere institution of a legal proceeding even with a malicious motive does not constitute an abuse of process." Fite v. Lee, 11 Wash.App. 21, 27-28, 521 P.2d 964, review denied, 84 Wash.2d 1005 (1974).
¶ 44 Here, Dennis is unable to show an improper purpose. The Saldivars' purpose in bringing the action  "making sure that Dr. Dennis Momah would never be permitted to practice"  is not an improper ulterior purpose of a tort suit alleging sexual abuse by a medical professional. Br. of Appellant (Saldivar) at 27-28 (quoting CP at 1534). It would be "strange indeed" if a successful claim that a physician sexually abused his patients would not also affect that physician's ability to practice medicine. See Mark, 45 Wash.App. at 192, 724 P.2d 428. But even if the Saldivars had fabricated Perla's claims of sexual abuse, the initiation of vexatious civil proceeding, although baseless, is not an abuse of process.[15] There must be an act after filing suit using legal process empowered by that suit to accomplish an end not within the purview of the suit. Batten v. Abrams, 28 Wash.App. 737, 749, 626 P.2d 984, review denied, 95 Wash.2d 1033 (1981). Dennis failed to prove such an act.
OUTRAGE
¶ 45 Dennis argues that if we find that the abuse of process claim fails, we should uphold the trial court's determination that the Saldivars committed the tort of outrage. We disagree.
¶ 46 In order for conduct to constitute the tort of outrage, it must be "`so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Wolf v. Scott Wetzel Servs., Inc., 113 Wash.2d 665, 677, 782 P.2d 203 (1989) (quoting Guffey v. State, 103 Wash.2d 144, 146, 690 P.2d 1163 (1984), overruled on other grounds by Savage v. State, 127 Wash.2d 434, 443, 899 P.2d 1270 (1995)). The elements of the tort of outrage are (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) the plaintiff actually suffers severe emotional distress. Kloepfel v. Bokor, 149 Wash.2d 192, 195, 66 P.3d 630 (2003). The law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it. RESTATEMENT (SECOND) OF TORTS § 46 cmt. j, at 77 (1965). The conduct must be more than insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Kirby v. City of Tacoma, 124 Wash.App. 454, 474, 98 P.3d 827 (2004), *1131 review denied, 154 Wash.2d 1007, 114 P.3d 1198 (2005).
¶ 47 But here, the Saldivars' decision to sue the Momah brothers does not rise to the level of outrageous conduct. Filing suit alleging sexual abuse by a physician, even with malicious intent (as the Momah brothers alleged but did not show), is not "so outrageous in character, [and] so extreme in degree, as to go beyond all possible bounds of decency" and to be "utterly intolerable in a civilized community." See Grimsby v. Samson, 85 Wash.2d 52, 59, 530 P.2d 291 (1975) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d, at 73 (1965)). Dennis cannot support a claim of outrage merely by accusing Perla of fabricating her claims to obtain money from him "under false pretenses." CP at 32; see Rice v. Janovich, 109 Wash.2d 48, 50, 62, 742 P.2d 1230 (1987) (permitting a plaintiff to claim emotional distress where masked, armed assailants approached him outside the tavern where he worked, grabbed him, held a gun to his head, threatened to "[b]low [his] head off," bound his hands and ankles, taped his mouth shut, dragged him by the ankles, face down, through the tavern and down a staircase into the kitchen, and then firebombed the tavern); see also Grimsby, 85 Wash.2d at 60, 530 P.2d 291 (finding outrage where, as a result of the defendant doctor's actions, the plaintiff was required to helplessly witness "the terrifying agony and explicit pain and suffering of his wife while she proceeded to die right in front of his eyes . . . because of his inability to secure any medical care or treatment for his wife") (emphasis omitted).
JURY TRIAL
A. WAIVER OF THE RIGHT TO A JURY TRIAL
¶ 48 The Saldivars argue that, although they admittedly failed to serve the jury demand on the defendants prior to the deadline, the trial court abused its discretion when it denied their request for a jury trial because (1) Dennis had actual notice of the demand as it was posted on the superior court's web-based Legal Information Network Exchange (LINX); and (2) Dennis used the term "jury" in his pleadings, indicating he knew the Saldivars intended for it to be a jury trial. Because the Saldivars did not serve their jury demand in accordance with CR 38(d) nor, in the alternative, did they substantially comply with the requirements of CR 38(d) such that the Momah brothers had "actual notice" of the jury demand, we affirm the trial court's order striking the jury demand.
¶ 49 In Washington, the right to a trial by jury is "inviolate" and neither legislative nor judicial action can impair it. CONST. art. I, § 21; see Sofie v. Fibreboard Corp., 112 Wash.2d 636, 656, 771 P.2d 711, 780 P.2d 260 (1989). CR 38(a) preserves this constitutional right, but CR 38(d) goes on to provide that "[t]he failure of a party to [1] serve a demand as required by this rule, [2] to file it as required by this rule, and [3] to pay the jury fee required by law in accordance with this rule, constitutes a waiver by him of trial by jury." (Emphasis added.) CR 38(d) is constitutional and enforceable. Sackett v. Santilli, 146 Wash.2d 498, 508, 47 P.3d 948 (2002).
¶ 50 If a party fails to demand a jury trial according to court rules, the trial court may use its discretion to order a jury trial despite the waiver; but absent an abuse of discretion, we will not overturn the trial court's decision to deny a jury demand after previous waiver. Mt. Vernon Dodge, Inc. v. Seattle-First Nat'l Bank, 18 Wash.App. 569, 581, 570 P.2d 702 (1977). Substantial compliance with CR 38 may be sufficient if the other party has actual notice of the jury demand. Wilson v. Olivetti N. Am., Inc., 85 Wash.App. 804, 810, 934 P.2d 1231, review denied, 133 Wash.2d 1017, 948 P.2d 388(1997).
¶ 51 Here, the Saldivars' suggestion that defense counsel could have found the jury demand by checking the court file on the internet does not establish actual knowledge. Nor does the defense counsel's use of the word "jury" establish "actual notice" of a jury demand. Moreover, we note that the statements on which the Saldivars rely are from defense briefs filed before the deadline for the jury demand. And review of these documents reveals that the terms "jury" and "finder of fact" are used interchangeably. Furthermore, allowing the Saldivars to have *1132 a jury trial at such a late stage would prejudice the defendants because the Momah brothers' trial counsel had prepared in anticipation of a bench trial and her strategy likely would have been significantly different had she been preparing in anticipation of a jury trial. Thus, because the Saldivars waived their right to a jury and, in the alternative, the defendants did not have actual notice of the jury demand, the trial court did not abuse its discretion by refusing the Saldivars' untimely jury demand.
B. REVIVAL OF THE TIMELINE FOR JURY TRIAL DEMAND
¶ 52 Next, the Saldivars contend that their amended complaint that added Charles as a defendant revived the deadline for the jury demand. Dennis responds that the Saldivars failed to preserve the issue because they did not make this argument until after the case concluded and the Saldivars moved for a new trial. Dennis further argues that the out-of-state cases cited by the Saldivars are not on point because they do not address jury demand deadlines set by case scheduling orders. We hold that the Saldivars did not revive their right to a jury trial when they amended their complaint.
¶ 53 Although Washington courts have not specifically addressed the issue of whether amending a complaint to add new issues revives the right to demand a jury trial,[16] the Ninth Circuit discussed the issue under the similar Fed.R.Civ.P. 38.[17]Clement v. Am. Greetings Corp., 636 F.Supp. 1326, 1334 (S.D.Cal.1986). The Clement court held that a previously waived right to jury trial will not be revived unless the amended or supplemental complaint raises new issues or changes the issues raised in the original complaint.[18] 636 F.Supp. at 1334. New claims that are merely a more detailed statement of the previously admitted claims are not sufficient to revive a previously waived jury trial right. See Clement, 636 F.Supp. at 1334 (citing Trixler Brokerage Co. v. Ralston Purina Co., 505 F.2d 1045, 1050 (9th Cir.1974)).
¶ 54 Here, the Saldivars' amended complaint added Charles as a co-defendant, but the allegations against Charles were identical to those against Dennis in the original complaint. The Saldivars broached the issue of "impersonation" in the original complaint and merely restated the issue with more specificity in the amended complaint by identifying the imposter as Charles and accusing him of some of the sexual abuse. Despite the addition of a defendant, the factual allegations underlying the claims and the claims themselves are identical to the original complaint and, thus, the Saldivars' jury trial revival argument lacks merit.
EVIDENTIARY RULINGS
¶ 55 The Saldivars contend that the trial court made numerous evidentiary errors. We review a trial court's evidentiary rulings for an abuse of discretion. Hoglund *1133 v. Meeks, 139 Wash.App. 854, 875, 170 P.3d 37 (2007). A trial court abuses its discretion when its decision is manifestly, unreasonable or based upon untenable grounds. Mayer v. Sto Indus., Inc., 156 Wash.2d 677, 684, 132 P.3d 115 (2006).
A. EVIDENCE OF IMPERSONATION
¶ 56 The Saldivars contend that the trial court erred when it granted Dennis's pretrial motion excluding the testimony of 116[19] lay witnesses who claimed to have personal knowledge of prior incidents of impersonation between Dennis and Charles. The trial court limited the witnesses to "those who have [such] experience at the Puyallup Clinic of U.S. Healthworks during [a] similar time period" as Perla's treatment. CP at 410.
¶ 57 First, the Saldivars argue that the evidence was relevant under ER 401 and admissible under ER 404(b) because it buttressed the Saldivars' contention that Dennis and Charles engaged in a common scheme or plan of trading places with each other at their respective clinics. Dennis responds that the information is highly prejudicial because of the nature of the case, and that the witnesses would have been unable to prove a "common scheme or plan" of Charles impersonating Dennis at Dennis's Puyallup clinic because the witnesses planned to testify regarding Dennis impersonating Charles at Charles's Burien Clinic during a different period of time. Because the evidence proffered would show that the Momah brothers engaged in a common scheme or plan in which they impersonated each other in their medical capacity, it is admissible under ER 404(b).
¶ 58 Under ER 401, evidence is "relevant" if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. ER 404(b) prohibits the admission of otherwise relevant evidence to show the character of a person to prove that the person acted in conformity with that character on a particular occasion.[20]State v. Everybodytalksabout, 145 Wash.2d 456, 466, 39 P.3d 294 (2002). Although inadmissible to prove propensity on a particular occasion, evidence of prior acts may be admissible for other purposes, including proof of motive, intent, modus operandi, or a common scheme or plan. State v. Monschke, 133 Wash.App. 313, 323, 335, 135 P.3d 966 (2006), review denied, 159 Wash.2d 1010, 154 P.3d 918 cert. denied, ___ U.S. ___, 128 S.Ct. 83, 169 L.Ed.2d 64 (2007). It is permissible to establish a common plan or scheme using evidence that a defendant committed "markedly similar acts of misconduct against similar victims under similar circumstances." State v. Lough, 125 Wash.2d 847, 852, 889 P.2d 487 (1995). Identity of the location or place of such conduct is not a prerequisite for admitting such evidence.
¶ 59 Here, evidence that Dennis had impersonated Charles at Charles's Burien clinic is relevant to show that the Momah brothers engaged in a common scheme or plan in which they impersonated each other in their medical capacity. Although the proffered testimony would prove that the impersonation took place at Charles's clinic during a different time period, the significance of the evidence is that it shows that Dennis and *1134 Charles used their similar appearances to impersonate each other in their medical capacity; the importance of the evidence stems from the evidence of professional impersonation, not when or where the twins impersonated each other or what harm ultimately resulted from the impersonation. Thus, the trial court improperly excluded the evidence of the Momah brothers' prior professional impersonation.
B. EVIDENCE OF COUNTERCLAIMS IN OTHER LAWSUITS AGAINST DENNIS
¶ 60 The Saldivars argue that the trial court erred when it excluded two documents that stated Dennis had made nearly identical counterclaims alleging that other plaintiffs accusing him of sexual abuse caused his stroke, job loss, and humiliation because these documents would have rebutted his claim that he suffered millions of dollars in lost earnings and emotional distress solely as a result of the Saldivars' claims against him. Dennis responds that the documents were cumulative and unnecessary because Dennis admitted during his testimony that he had alleged in these two documents, as well as 17 other counterclaims, that other Bharti clients had caused his injuries.
¶ 61 Courts have occasionally held that prior crimes, wrongs, or acts are relevant to the issue of damages in civil cases. See 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 404.14, at 513 (5th ed.2007). But it is not error to exclude cumulative evidence. ER 403; Silves v. King, 93 Wash.App. 873, 885, 970 P.2d 790 (1999) (erroneous exclusion of cumulative evidence is harmless). Here, because Dennis testified that he made identical counterclaims in 19 other suits, the exhibits were cumulative and the trial court did not abuse its discretion when it excluded the documents.
C. KLINGBEIL'S TESTIMONY
¶ 62 The Saldivars argue that the trial court erred when it excluded the testimony of Klingbeil, finding that she was not qualified to testify regarding "psychiatric conditions." Br. of Appellant (Saldivar) at 41 (quoting CP at 408). The Saldivars argue that this testimony was critical to explain Perla's decision to return to U.S. Healthworks for treatment after her alleged abuse and to explain her inconsistent recall of dates, times, and events.[21] Dennis responds it was disingenuous for the Saldivars to suggest that Klingbeil's testimony was "anything other than a Trojan horse for an opinion that Perla was truthfully reporting sexual abuse [by] Dr. Momah." Br. of Resp't at 58. Because Klingbeil is a nationally-recognized psychiatric professional, she was qualified to testify as to Perla's mental state and the possible effect it could have on her resulting behavior.
¶ 63 The test for deciding whether to allow expert testimony is left to the sound discretion of the trial court and will be reversed by a reviewing court only upon a showing of a manifest abuse of that discretion. Harris v. Robert C. Groth, M.D., Inc., PS, 99 Wash.2d 438, 450, 663 P.2d 113 (1983) (citing Balmer v. Dilley, 81 Wash.2d 367, 372, 502 P.2d 456 (1972)). But the standard that the trial court must apply in deciding whether to exercise its discretion has three parts: (1) is the witness qualified to testify as an expert, (2) is the expert's theory based on a theory generally accepted in the scientific community, and (3) would the testimony be helpful to the fact finder? Philippides v. Bernard, 151 Wash.2d 376, 393, 88 P.3d 939 (2004) (citing State v. Allery, 101 Wash.2d 591, 596, 682 P.2d 312 (1984)). An expert witness may not state an opinion about a party's credibility. State v. Warren, 134 Wash.App. 44, 52-53, 138 P.3d 1081 (2006), review granted, 161 Wash.2d 1001, 166 P.3d 719 (2007); State v. King, 131 Wash.App. 789, 797, 130 P.3d 376 (2006), review denied, 160 Wash.2d 1019, 163 P.3d 793 (2007).
¶ 64 The trial court may, at its discretion, allow social workers to testify regarding mental conditions if offered for reasons other than assessment of the alleged *1135 victim's credibility. In re Det. of A.S., 138 Wash.2d 898, 917-18, 982 P.2d 1156 (1999); State v. Stevens, 58 Wash.App. 478, 496, 794 P.2d 38, review denied, 115 Wash.2d 1025, 802 P.2d 128 (1990).
¶ 65 Here, because PTSD causes a person to be "overwhelmed," "confused," and "in disarray mentally," it is relevant to explain one possible reason for Perla's apparent inability to tell a consistent story. CP at 440. But the trial court categorically excluded Klingbeil's testimony, finding that "[she] was not qualified to opine on psychiatric conditions" (CP at 408) and that with "a master of social work . . . was in no way qualified to make any kind of diagnosis of [PTSD]." CP at 408. But our Supreme Court has held that social workers may render opinions on the existence of mental disorder because it is clearly within their scope of practice. See A.S., 138 Wash.2d at 917-18, 982 P.2d 1156. Klingbeil's graduate education in social work and her years of experience qualify her to render an opinion about whether or not Perla suffered from PTSD and how it might have affected her ability to "act" like a victim. See A.S., 138 Wash.2d at 917-18, 982 P.2d 1156; see also Stevens, 58 Wash.App. at 496, 794 P.2d 38.
¶ 66 Notably, our Supreme Court has previously held that Klingbeil is qualified to diagnose victims of domestic violence as suffering from battered woman's syndrome, a subcategory of PTSD. See State v. Ciskie, 110 Wash.2d 263, 279, 751 P.2d 1165 (1988); see also Allery, 101 Wash.2d at 596, 682 P.2d 312. And there is a reasonable correlation between victims of domestic violence displaying symptoms of PTSD and victims of sexual abuse displaying symptoms of PTSD. Because under ER 702, Klingbeil is a qualified expert through her education and experience, the trial court abused its discretion when it ignored Klingbeil's experience and held categorically that her masters in social work degree disqualified Klingbeil as an expert and refused to allow her to testify that Perla suffered from PTSD and discuss its effects.
D. VIDEO TAPE RECORDING OF CHARLES
¶ 67 The Saldivars argue that the trial court erred when it excluded a news broadcast video tape recording featuring Charles based on lack of authentication. They argue that either Perla or Dennis could have authenticated the recording by identifying the man on the recording as Charles. Dennis responds that, although Dennis or Perla[22] could have identified Charles, neither of them could testify as to when, where, and under what circumstances the recording was made and, thus, could not properly authenticate the recording. Because the Saldivars did not properly authenticate the recording, the trial court properly excluded it.
¶ 68 Courts treat video tape recordings and motion pictures like photographs for purposes of authentication. State v. Newman, 4 Wash.App. 588, 593, 484 P.2d 473, review denied, 79 Wash.2d 1004 (1971). And Washington courts have a policy of liberal admissibility of photographs.[23]See e.g., State v. Payne, 25 Wash.2d 407, 413, 171 P.2d 227 (1946). To lay proper foundation for admitting a video tape recording, some witness, not necessarily the photographer, must be able to give some indication as to when, where, and under what circumstances the video tape recording was taken and that it accurately portrays the subject illustrated; then the video tape recording is admissible at the trial court's discretion. Newman, 4 Wash.App. at 593, 484 P.2d 473. Here, because the Saldivars failed to call any witnesses who could testify as to when, where, and under what circumstances the recording was made, it was not properly authenticated and the trial court properly excluded it.
MQAC MEMORANDUM AND LYNN LARSEN-LeVIER'S TESTIMONY
¶ 69 The Saldivars argue that the court erred when it excluded the testimony *1136 of MQAC investigators while admitting the MQAC investigator's memorandum summarizing Perla's interview because "it's author was available to testify." Br. of Appellant (Saldivar) at 46. Dennis responds that any statements in the memorandum were Perla's statements and admissible as a party admission. Dennis further argues that he did not offer the MQAC memorandum for the truth of the matter asserted, but rather to impeach Perla's testimony about contact with MQAC after 2003.
¶ 70 Hearsay is any out-of-court statement made to prove the truth of the matter asserted. ER 801(c). Admissions of a party-opponent are not hearsay and may be admitted as substantive evidence. ER 801(d)(2). Here, the trial court properly admitted the MQAC memorandum because Dennis used the document to impeach Perla's testimony and did not offer it to prove the truth of the matter asserted. In addition, any hearsay statements within the document are Perla's statements, admissible under the party admission exemption to the hearsay rule. See ER 801(d)(2).
¶ 71 Next, the Saldivars argue that the trial court should have permitted Larsen-LeVier, the MQAC investigator who drafted the above memorandum after interviewing Perla, to testify because she would have corroborated Perla's testimony that she did not use the word "rectum" in her interview. Although the Saldivars made an offer of proof regarding Larsen-LeVier's testimony, they did not indicate that she would have testified that Perla did not say "rectum" in her interview. Because the Saldivars failed to make an offer of proof at the trial that she would have so testified, they did not properly preserve the issue for appeal. See Kysar v. Lambert, 76 Wash.App. 470, 490-91, 887 P.2d 431 (citing ER 103(a)(2)), review denied, 126 Wash.2d 1019, 894 P.2d 564 (1995).
PERLA'S STATEMENTS
¶ 72 The Saldivars argue that the trial court erred when it excluded, as hearsay, statements Perla made shortly after her visits to U.S. Healthworks to her husband and father as well as her good friend, Wiesniewski, and her translator, Fuentes. Because evidence of Perla's prior consistent statements to friends and family were admissible to rebut Dennis's allegation of recent fabrication and Perla's credibility was directly at issue, the trial court erred when it excluded this evidence.
¶ 73 Under ER 801(d)(1), a witness's prior consistent statement is admissible if the witness has been impeached and the statement is offered to rebut a charge of recent fabrication, improper influence, or improper motive. But an error, in admitting evidence is not grounds for reversal unless it prejudiced the party offering it. Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wash.2d 188, 196, 668 P.2d 571 (1983). When an evidentiary rule is violated, that error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred. Doe v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints, 141 Wash.App. 407, 437, 167 P.3d 1193 (2007).
¶ 74 Here, the trial court erred when it excluded Perla's prior consistent statements as hearsay because the Saldivars offered these statements to rebut Dennis's allegation of recent fabrication. Furthermore, because these statements bolster Perla's credibility, it is likely that excluding this evidence had a material prejudicial effect on the trial's outcome which rested on the trial court's finding that Perla was not credible.
SANCTIONS AGAINST BHARTI
¶ 75 The trial court used its inherent power to provide for the orderly conduct of proceedings before it and CR 11 to sanction the Saldivars' attorney. Bharti appealed the sanctions, making free speech,[24] due process,[25] *1137 and other vague constitutional arguments regarding the trial court's imposition of the sanctions, along with arguments regarding collateral estoppel, immunity under RCW 4.24.510,[26] and challenging the veracity of various findings of fact. Because the trial court systematically excluded or refused to examine evidence that could have corroborated Perla's claims, it abused its discretion when it sanctioned Bharti for its determination that Perla was not a credible witness.
¶ 76 We review a trial court's order imposing sanctions, whether under its inherent authority or CR 11, for abuse of discretion. Manteufel v. Safeco Ins. Co. of Am., 117 Wash.App. 168, 175-76, 68 P.3d 1093, review denied, 150 Wash.2d 1021, 81 P.3d 119 (2003); State v. S.H., 102 Wash. App. 468, 473, 8 P.3d 1058 (2000). "A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds." State v. Perrett, 86 Wash.App. 312, 319, 936 P.2d 426 (1997) (quoting Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 168, 876 P.2d 435 (1994)), review denied, 133 Wash.2d 1019, 948 P.2d 387 (1997). When a specific sanction rule applies, the inherent power of the trial court to sanction does not apply. See Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 340, 858 P.2d 1054 (1993) (inherent power of the trial court should not be resorted to where rules adequately address the problem). We may affirm on any ground adequately supported by the record. LaMon v. Butler, 112 Wash.2d 193, 200-01, 770 P.2d 1027, cert. denied, 493 U.S. 814, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989).
A. COMPLAINT, AMENDED COMPLAINT, INTERROGATORIES, DECLARATIONS, AND DISCOVERY RESPONSES
¶ 77 Here, the trial court sanctioned Bharti because it concluded that he was "an active and knowing participant in the fabrication of Perla Saldivar's ever changing accusations" (CP at 1530), because he (1) signed the initial and amended complaint and responses to interrogatories "without a reasonable belief that [they] were well grounded in fact" (CP at 1530), (2) "prepared declarations for [Perla] to sign either knowing they were false or at least in reckless disregard of their truth or falsity" (CP at 1531), and (3) signed discovery responses that "contradicted [Perla's] sworn testimony and are inconsistent with the medical records and evidence" (CP at 1535). Each of the bases for the trial court's imposition of sanctions rests solely on the trial court's view of Perla's credibility and reliance on the medical records created by the defendants. But, absent a showing that the attorney suborned perjury, it is improper to impose sanctions on an attorney based solely on the ultimate determination of his client's credibility.
¶ 78 The intent of CR 11 is not to chill an attorney's enthusiasm or creativity in pursuing actual or legal theories because, if excessive use of sanctions chilled vigorous advocacy, wrongs would be uncompensated. Bryant v. Joseph Tree, Inc., 119 Wash.2d 210, 219, 829 P.2d 1099 (1992). Specifically, attorneys, because of fear of sanctions, might turn down cases on behalf of uncharismatic individuals seeking redress in the courts. See Bryant, 119 Wash.2d at 219, 829 P.2d 1099. That said, an attorney is required to conduct an investigation before filing a complaint and attest by his signature that it was "reasonable to believe at the time [that the information contained in] the pleading, motion or legal memorandum" is true. Bryant, 119 Wash.2d at 220, 829 P.2d 1099. Moreover, CR 11 sanctions should not exceed fees and costs incurred for a defendant to respond to a complaint. Exceeding these fees and costs transforms CR 11 motions for sanctions into a counterclaim without any of *1138 the procedures, burden of proof, or defenses of filing a counterclaim.
¶ 79 Although there is no case law in Washington that specifically holds that it is improper for a trial court to impose CR 11 sanctions purely because an attorney failed to properly assess the court's determination of his client's credibility, various federal courts have held that such sanctions are improper. See, e.g., Mar Oil, S.A. v. Morrissey, 982 F.2d 830, 844 (2d Cir.1993) (an unfavorable credibility assessment is rarely a sufficient basis for an award of CR 11 sanctions); Healey v. Chelsea Res., Ltd., 947 F.2d 611, 626 (2d Cir.1991). CR 11 is directed to remedy situations "where it is patently clear that a claim has absolutely no chance of success," and courts "must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any and all doubts must be resolved in favor of the signer." Doe v. Spokane & Inland Empire Blood Bank, 55 Wash.App. 106, 122, 780 P.2d 853 (1989) (quoting Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 254 (2d Cir.1985)).
¶ 80 Here, in addition to interviewing Perla, Bharti interviewed Perla's friends and family, all of whom related that Perla had told them about the sexual abuse. Bharti also relied on accounts from his numerous other clients and similar cases against Charles which corroborated Perla's reports of the abuse she experienced when he filed the complaint, drafted declarations, or responded to discovery requests. Although some of the evidence on which Bharti relied was inadmissible, it is nonetheless proper to consider its influence on an attorney's assessment of his client's credibility or his willingness to take a case; this evidence was still part of the investigation Bharti used in determining whether Perla fabricated her testimony. Cf. Bokor v. Dep't of Licensing, 74 Wash.App. 523, 526, 874 P.2d 168 (1994) (evidence inadmissible at trial may nevertheless be relied upon in making a probable cause determination) (citing Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Because Bharti took reasonable steps to investigate Perla's claims, the trial court cannot reasonably sanction him solely for failing to accurately assess his client's ultimate credibility. Moreover, we note that, even in the criminal context where the burden of proof is beyond a reasonable doubt, a credible victim's testimony can be sufficient to prove that a sex crime occurred. See RCW 9A.44.020(1) ("to convict a person of any [sex offense] it shall not be necessary that the testimony of the alleged victim be corroborated."). The record is insufficient to support the trial, court's imposition of sanctions under CR 11.
B. IMPROPER PURPOSE
¶ 81 The trial court found that Bharti filed and maintained this action "for the improper purpose of furthering [the Saldivars'] effort to assure that the Momah brothers' reputations were destroyed and that they would never be permitted to practice medicine," and to "improperly influence public opinion and gain advantage in other litigation." CP at 1531. This holding with respect to Bharti filing this suit and serving process mirrors the court's abuse of process holding and, for the same reasons, is flawed.[27]
C. VIOLATION OF A KING COUNTY TRIAL COURT'S PROTECTIVE ORDER
¶ 82 The trial court also found that Bharti improperly influenced and tainted Perla's testimony when he showed her a video tape recording deposition of Charles during a noon recess on the day of her testimony[28] and violated a King County protective order by doing so. Bharti asserts that it is permissible under ER 612 to "refresh" a witness's recollection prior to her testimony without showing the document to opposing counsel. Bharti further asserts that he did not violate the King County protective order because the order allowed the video tape recording to be used "in all remaining open cases," and, thus, he reasonably *1139 believed he was authorized to use it in the Saldivars' case. CP at 1425. Bharti's arguments are disingenuous.
¶ 83 The video tape recording at issue was an image of Charles that Perla had never seen before and, after having her memory "refreshed" by a brand new image, she testified to differences between Charles and Dennis that were not a result of her experiences or memory, but rather the video tape recording that Bharti had just shown her. Moreover, we note that Bharti blatantly misrepresents the scope of the King County protective order. The order clearly states that "the contents of the deposition and the video may only be shown to attorneys, witnesses and support staff involved in this [King County] case and may not be disseminated further until further order of the court." CP at 1487 (emphasis added). Thus, Bharti appears to have violated the King County protective order.
D. OTHER SANCTIONS
¶ 84 The Momah brothers also point to several other allegations of misconduct. For example, the Momah brothers point to the trial court's finding that Bharti "actively participated" in Perla's fabrication and ever changing story. But the trial court did not enter specific findings, only general findings which are insufficient to permit meaningful review. In re Dependency of C.R.B., 62 Wash.App. 608, 618, 814 P.2d 1197 (1991) (quoting In re Det. of LaBelle, 107 Wash.2d 196, 218, 728 P.2d 138 (1986)). Although the findings are insufficient to support sanctions based on Bharti's alleged participation in "fabricating" Perla's story, Bharti may be subject to sanctions for affirmatively lying to the court regarding the Saldivars' second MQAC report, filing documents to further other litigation and the like, if there is sufficient evidence and findings to support the sanctions.[29]
E. ORDER TO SHOW CAUSE
¶ 85 The trial court ordered Bharti to show cause why he should not be held in contempt for failure to post the trial court's findings of fact and conclusions of law on his website and for failure to pay the $300,000 non-compensatory sanction by the trial court's deadline. Bharti argues that the trial court should not have ordered him to show cause, but it is unclear if the hearing to show cause has actually taken place and how this court's order staying the payment of financial sanctions may have affected these proceedings. Moreover, Bharti has not provided this court with the relevant report of proceeding or clerk's papers. And an order to show cause is not a final judgment subject to review by this court. See RAP 2.2(a)(1).
¶ 86 Accordingly, we reject the appellants' argument that RCW 4.24.510 immunizes them from liability for their civil suit. We also affirm the trial court's decision to (1) strike the Saldivars' late jury demand, (2) exclude the KOMO-4 video tape recording, and (3) admit the MQAC investigative memorandum. But we reverse the trial court's judgment on (1) the abuse of process and outrage claims, as well as (2) the trial court's decision excluding from consideration (a) evidence that Dennis and Charles professionally impersonated each other at Charles's clinic, and (b) Klingbeil's testimony that Perla suffered from PTSD. Lastly, we reverse the trial court's imposition of sanctions in excess of attorney fees and costs and those sanctions imposed on Bharti under CR 11 for his clients' apparent lack of credibility at trial and remand for a determination of what sanctions, if any, may appropriately be imposed for Bharti's misrepresenting to the trial court the extent of his contact with MQAC actions and whether sanctions should be imposed by the Pierce County court for a violation of a King County court's protective order limiting dissemination of discovery in another case as well as Bharti's other sanctionable behavior that may be sufficiently supported by the evidence to allow the trial court to enter appropriate and detailed factual findings.
We concur: ARMSTRONG, P.J., and HUNT, J.
NOTES
[1] We use first names for clarity.
[2] Specifically, Perla suffered from multiple contusions between her left thigh and shoulder, as well as cervical and lumbar strains.
[3] Dennis sprained his ankle in May or June of 2003, and wore a blue "orthopedic" shoe with a velcro closure when his regular shoe was too painful to wear.
[4] On May 27, June 19, and June 26, 2003. There is no record of any visit on June 19.
[5] On May 27, May 29, June 4, and June 26, 2003.
[6] Both Dennis and Charles have scars on their faces, put there by their grandmother when they were three months old to be able to differentiate between them.
[7] The Court of Appeals affirmed Charles's convictions. State v. Momah, 141 Wash.App. 705, 171 P.3d 1064 (2007), review granted, 163 Wash.2d 1012, 180P.3d 1291 (2008).
[8] Without citation to authority or argument, the Saldivars suggest that the trial court improperly ordered sua sponte that MQAC produce its files before trial and that it used this evidence in determining Perla's and Bharti's credibility. But the record before us is insufficient to enable us to address the propriety of the trial court's order directing the MQAC to produce these records, and we decline to address this issue.
[9] Albert testified that Perla told him that the doctor had inserted his finger into her vagina and that she thought two different doctors had been involved. Albert conceded that, while he did call the clinic to request Dr. Momah not treat Perla again, he did not mention anything about improper touching. He also testified that he drove Perla to one visit in June 2003.
[10] Perla's primary language is Spanish.
[11] The Saldivars had several attorneys  Bharti, Jason Anderson, and Marja M. Starczewski.
[12] RCW 4.24.510 states:

A person who communicates a complaint or information to any branch or agency of federal, state, or local government, or to any self-regulatory organization that regulates persons involved in the securities or futures business and that has been delegated authority by a federal, state, or local government agency and is subject to oversight by the delegating agency is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization. A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall receive statutory damages of ten thousand dollars. Statutory damages may be denied if the court finds that the complaint or information was communicated in bad faith.
[13] Charles did not join in any of Dennis's counterclaims.
[14] Strategic lawsuits against public participation. Laws of 2002, ch. 232, § 1.
[15] It is important to note the distinction between abuse of process and malicious prosecution. To maintain an action for malicious prosecution, the plaintiff must allege and prove the following:

(1) that the prosecution claimed to have been malicious was instituted or continued by the defendant; (2) that there was want of probable cause for the institution or continuation of the prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury or damage as a result of the prosecution.
Peasley v. Puget Sound Tug & Barge Co., 13 Wash.2d 485, 496, 125 P.2d 681 (1942). As a result, while abuse of process is not satisfied by proof of the initiation of vexatious legal proceedings, malicious prosecution is. See Peasley, 13 Wash.2d at 496, 125 P.2d 681.
[16] In Washington, the right to trial by jury is revived where a mistrial is declared or the case is remanded for a new trial on appeal. See Wilson v. Horsley, 137 Wash.2d 500, 511, 974 P.2d 316 (1999).
[17] The Saldivars cite numerous decisions from other states supporting their argument that the right to a jury trial is "revived" by amending a pleading to include new issues or facts. See, e.g., Ex Parte Jackson, 737 So.2d 452, 454 (Ala.1999) (new claims raised in an amended pleading renews period for jury demand); Javit v. Marshall's, Inc., 40 Conn.App. 261, 266, 670 A.2d 886 (when the original period for jury demand has expired, a new period may be created by filing an amended pleading, if it introduces a new issue of fact into the case), appeal denied, 236 Conn. 915, 673 A.2d 1142 (1996); Adler v. Seligman of Florida, Inc., 492 So.2d 730, 733 (Fla.Dist.Ct.App.1986) ("the filing of an amended pleading which injects a `new issue' into the case revives the time for filing a demand for jury trial"), review denied, 503 So.2d 328 (Fla.1987); Morrison v. Wyrsch, 93 N.M. 556, 558, 603 P.2d 295 (1979) (defendant allowed to demand jury on new issues only when time had elapsed after defendant filed amended answer including a counterclaim with new issues); In re Estate of Schneier, 74 A.D.2d 22, 28, 426 N.Y.S.2d 624 (N.Y.App.Div.1980) (defendant was allowed to demand a jury because of newly revived time period).
[18] The revival right to a jury trial extends only to the new issues raised by the amended or supplemental pleading and does not include issues that were previously raised or are repeated by the amended or supplemental pleading. Clement, 636 F.Supp. at 1334.
[19] The Saldivars' rebuttal witness disclosure listed 126 numbered impersonation witnesses: # 1 through # 10, followed by # 1 through # 116. Close review indicates, however, that there were closer to 80 witnesses, because at least 43 names appear on the list twice or more, including Perla (# 13 and # 71) and Albert (# 17 and # 76). Although we hold that the court improperly excluded this impersonation evidence, we do not intend to suggest that it was required to admit cumulative testimony from each listed witness. ER 403 (although relevant, evidence may be excluded if it is needless presentation of cumulative evidence); see also State v. French, 157 Wash.2d 593, 605, 141 P.3d 54 (2006).
[20] Although ER 404(b) was designed primarily for criminal cases, nothing precludes its application in civil cases. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 404.14, at 511 (5th ed.2007). Courts have occasionally cited ER 404(b) as governing the admissibility of prior crimes, wrongs, or acts in civil cases as well. 5 TEGLAND, supra. The results typically parallel the results in criminal cases. See also Himango v. Prime Time Broad., Inc., 37 Wash.App. 259, 680 P.2d 432, review denied, 102 Wash.2d 1004 (1984); Conrad v. Alderwood Manor, 119 Wash. App. 275, 78 P.3d 177 (2003).
[21] The Northwest Women's Law Center and the Washington Coalition of Sexual Assault Programs submitted an amicus curiae brief in support of the Saldivars in their argument that Klingbeil's testimony should have been admitted to explain Perla's behavior.
[22] We note that Bharti may have impermissibly influenced Perla's identification of Charles because, during the lunch recess taken while in the middle of Perla's testimony, he showed her a video tape recording deposition of Charles from one of Charles's criminal cases.
[23] Dennis unpersuasively argues that the video tape recordings should be subject to the more stringent requirements for audio tape recordings.
[24] Bharti argues that this order is "a direct restriction on [his] non-commercial speech on matters of general public concern." Br. of Appellant (Bharti) at 45. Alternatively, Bharti argues that the order is an "unduly burdensome disclosure requirement." Br. of Appellant (Bharti) at 46 (quoting Ibanez v. Florida Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy, 512 U.S. 136, 146, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994)).
[25] Bharti argues that his right to due process was violated because he was only given four days to draft a written response to the order to show cause why he should not be sanctioned. At the hearing, Bharti did not request additional time or suggest what he would have done in additional time.
[26] The Luvera Law Firm filed an amicus curiae brief in support of Bharti's argument that he is immunized from liability under RCW 4.24.510. For reasons related to those discussed previously with regard to the Saldivars, RCW 4.24.510 does not confer immunity on an attorney representing plaintiffs in a private action.
[27] In his argument, Dennis does not distinguish between Bharti initiating this lawsuit and serving process and the improper use of the press to ostensibly gain an advantage in other litigation.
[28] The video tape recording deposition was made for one of Charles's criminal cases.
[29] See note 8, supra.