IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>JACOB DEE VERNON,<br><br>Appellant. | No. 83873-3-I<br><br>UNPUBLISHED OPINION |

BOWMAN, J. — Jacob Dee Vernon appeals his conviction for domestic violence (DV) second degree rape, arguing the trial court erred by granting the State's GR 37 challenge to his peremptory strike of a Black juror, excluding evidence as hearsay, and inaccurately instructing the jury. Vernon also argues that RCW 9A.44.050(1)(b) is unconstitutionally vague and overbroad. Finally, Vernon argues that the trial court abused its discretion by imposing unconstitutionally vague conditions of community custody. We affirm.

FACTS

Vernon and M.Y. met in high school in 2011. Vernon is a white male and M.Y. is a Black female. They dated briefly until M.Y. moved to another state in November 2011. Three years later, M.Y. returned to Washington, and the couple resumed their relationship in June 2014.[1] Almost two months later, M.Y. moved into Vernon's Burien house, which they shared with his grandmother and mother, Amber Akai. Akai's boyfriend, Bentley Artisan, was often in the home, too.

---

[1] M.Y. was 19 years old and Vernon was 18.

Vernon and M.Y. had an unstable relationship. Vernon often broke up with M.Y. for a "variety" of reasons and would kick her out of his home, forcing her to stay with family. Then he would apologize and M.Y. would return. During conflicts, Vernon sometimes told M.Y. that he would prefer to date a white person and questioned whether their children "would be [B]lack."

In late 2017, M.Y. began living with her aunt in Federal Way. On Saturday, September 9, 2018, Vernon and M.Y. got in a fight while out dancing with M.Y.'s friend. Vernon told M.Y., " 'I don't want to be with you,' " " 'You're a bitch,' " and, " 'It's better if I date a white girl.' " Feeling embarrassed about how he treated her in front of other people, M.Y. tried to end the relationship. But after Vernon said he would go to therapy, M.Y. agreed to "attempt to start fresh."

Later that week on September 13, 2018, M.Y. planned to spend the night at Vernon's house. She arrived at his house in the early evening. M.Y.'s friend Kamari Mack also came over. Vernon's mother Akai and her boyfriend Artisan were also home but mostly stayed in Akai's room.

Vernon, M.Y., and Mack drank alcohol for a couple hours and then decided to get in the hot tub. While in the hot tub, Vernon expressed that he no longer wanted to go to therapy, which provoked an argument. After soaking about 30 minutes, Vernon and M.Y. left the hot tub to take a shower. M.Y. described herself as "tipsy, especially after the hot tub."[2]

After showering, the couple dried off in Vernon's room and got ready for bed. M.Y. asked Vernon to rub oil on her back. As he did, he began to rub his

---

[2] M.Y. testified that she had "[m]aybe two" drinks.

2

erection against her. M.Y. told Vernon that she "wasn't interested in having sex that night." Vernon backed off for a moment, but then continued to rub against her. M.Y. turned around, pushed Vernon away, and told him again, " 'I do not want to have sex tonight.' "

Vernon grabbed M.Y. and "threw" her onto the bed. M.Y. continued to tell Vernon to stop, but he did not. Vernon "crawled" toward her while she tried to kick him away, "telling him to stop." Vernon grabbed her legs and put them over his shoulders. He then pinned her hands above her head. M.Y. continued to tell Vernon "no" and "stop," but Vernon ignored her and forced her to have sex. Throughout the rape, she continued to pull away and tell Vernon to stop. After a few minutes, M.Y. started to cry, and Vernon "began smiling at [her]." He then stopped and moved under the bed covers.

M.Y. got dressed and told Vernon that "he raped [her]." Vernon responded by asking, " 'You're seriously crying right now?' " M.Y. grabbed her things and left. She drove about five blocks, then decided to return to Vernon's house to confront him. When she arrived back at his house, Vernon and Mack were sitting in the living room, "joking" and "laughing." M.Y. sat down with them and after a short conversation, she said, " 'Rape is bad,' " upsetting Vernon and prompting Mack to leave.

After Mack left, Vernon apologized for the assault and said it would not happen again. But then he accused M.Y. of "being dramatic and trying to start problems." M.Y. decided to leave again. As she left the house, Akai came into the kitchen and overheard M.Y. tell Vernon, " 'You know what happened.' " M.Y.

then called Akai from the car and told her about the rape.[3]  A few days later, she reported the rape to Burien police.

The State charged Vernon with one count of DV second degree rape.  At trial, Vernon tried to use a peremptory strike on juror 22, a Black man.  The State challenged the strike under GR 37.  The court granted the State's objection and refused to strike the juror.

Vernon testified at trial and denied raping M.Y.  According to Vernon, when M.Y. returned to his house to "confront" him, he left for about 10 minutes to get food from Taco Bell.  When he returned, Mack had left, and his mom was coming and going from the kitchen while he and M.Y. sat in the living room talking.  Akai testified that she heard M.Y. and Vernon in the shower, and about 35 minutes later, saw M.Y. and Mack in the hallway, "talking and laughing."  Shortly after, Vernon arrived home with Taco Bell, and he and M.Y. sat in the living room talking while he ate the food.  Artisan testified that he went to the kitchen at about 10:15 p.m., saw M.Y. and Mack "talking and laughing," then Vernon arrived home with Taco Bell.  On cross-examination, M.Y. testified that she did not remember Vernon leaving to get food.

Vernon sought to elicit testimony from Akai that on the night of the incident, she heard M.Y. tell Vernon, " 'I never said you raped me, but I said stop and you didn't.' "  The State objected to the testimony as hearsay and the court excluded it.

---

[3] M.Y. also told her mother, her aunt, and a friend about the rape that night. When she got home, her friend picked her up and drove her to the hospital.  M.Y. underwent a sexual assault examination but did not tell hospital staff who raped her.

The court gave the jury the to-convict instruction as proposed by both parties. The jury found Vernon guilty as charged. The trial court imposed a low-end, standard-range, indeterminate sentence of 78 months to life and several community custody conditions.

Vernon appeals.

ANALYSIS

Vernon argues that the trial court erred by granting the State's GR 37 challenge to his peremptory strike of a Black juror, excluding evidence as hearsay, and inaccurately instructing the jury. And he argues that the second degree rape statute, RCW 9A.44.050(1)(b), is unconstitutionally vague, overbroad, and violates his substantive due process rights. Finally, Vernon argues that the trial court abused its discretion by imposing unconstitutionally vague conditions of community custody. We address each argument in turn.

1. GR 37

Vernon argues the trial court erred by granting the State's GR 37 challenge to his peremptory strike of a Black juror. We disagree.

We review a trial court's decision on a GR 37 challenge de novo. *State v. Omar*, 12 Wn. App. 2d 747, 751, 460 P.3d 225 (2020).[4] Under GR 37(c), a party or the court "may object to the use of a peremptory challenge to raise the issue of

---

[4] In *State v. Tesfasilasye*, 200 Wn.2d 345, 355-56, 518 P.3d 193 (2022), our Supreme Court applied de novo review to a GR 37 challenge when "there were no actual findings of fact and none of the trial court's determinations apparently depended on an assessment of credibility." Because the parties do not assert that a different standard applies here, we review the trial court's decision de novo. And because we review the decision de novo, we do not address Vernon's arguments about procedural error.

improper bias." If there is such an objection, the party exercising the challenge must "articulate the reasons the peremptory challenge has been exercised." GR 37(d). The court evaluates those reasons in light of the totality of the circumstances, and if "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e). "[A]n objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington." GR 37(f). The same standards apply whether the State or a defendant makes a GR 37 challenge to a peremptory strike. *State v. Booth*, 22 Wn. App. 2d 565, 572, 510 P.3d 1025 (2022).

Under the objective observer standard, we take a rational view of the totality of the circumstances. *Booth*, 22 Wn. App. 2d at 572. We evaluate the reasons given to justify the challenge in light of the totality of the circumstances to understand whether the striking party's reasons for exercising the strike could have masked either a conscious or unconscious decision based on race. *Id.* at 572-73. Under GR 37(g), some circumstances we consider are

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

6

(iii)  whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

(iv)  whether a reason might be disproportionately associated with a race or ethnicity; and

(v)  whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

Here, during voir dire, Vernon's attorney questioned juror 22, a former prosecuting attorney:

[DEFENSE COUNSEL]:    Good morning.  I see that you've never served on a jury, but you certainly have some experience in the criminal justice system.  Is that right?
JUROR 22:   That is true.  Professional experience, to be clear.
[DEFENSE COUNSEL]:    Professional, of course.  What are some of the things that you look at in your capacity as an attorney to evaluate people's credibility?
JUROR 22:   The facts.  Look at the information that's presented, and the logic behind it as well.  If one thing is true, then that means that several other things along the line have to be true as well.  So, I look at the facts and the information and take the information that's presented, compare it to the objective information to the extent that we have it.
[DEFENSE COUNSEL]:    When you're evaluating credibility, do you also consider the bias or motivations of one or the other of the parties?
JUROR 22:   If it's made clear.  I think it's part of the evaluation process, sure.
[DEFENSE COUNSEL]:    And how many versions of the truth are there?  Kind of an interesting question, but how many versions of the actual truth exist?
JUROR 22:   In my mind, there's one, but there's many perspectives that could bear on how we arrive on that one piece of the truth.
[DEFENSE COUNSEL]:    Explain that a little bit more.
JUROR 22:   If everyone has their own perspective in terms of how they see things, — and this is from my experience.  But in terms of what actually happened and what the truth is, there's only one truth.  Sometimes we may not get to it.  Sometimes we may get close to it.  But you look at different people's perspectives and then

7

as jurors it would be our job to determine what the actual facts are as to what occurred.

    [DEFENSE COUNSEL]: So would you agree with the statement that there may be one truth but there may be more than one perception of that truth?

    JUROR 22: Agreed.

After voir dire, three Black jurors remained subject to peremptory strikes.[5] The court allowed Vernon to strike juror 8 first, a Black juror and former police officer suffering from anxiety. As his fourth strike, Vernon asked to excuse juror 22. The State objected under GR 37. Vernon's attorney explained that he personally knew the juror for over 25 years and sought to excuse him because juror 22 was a former prosecutor and city attorney. He argued that juror 22 would favor the State's evidence and influence the other jurors. The court upheld the State's GR 37 challenge.

The trial court did not err by granting the State's GR 37 objection to striking juror 22. Vernon did not ask juror 22 about whether his experience as a former prosecutor would affect his ability to serve as an impartial juror. And two of Vernon's first four strikes suggested a pattern of eliminating Black jurors.[6] Viewed in context of the accusation that a white defendant raped his Black girlfriend, especially where race played a role in the dynamics of their relationship, an objective observer could conclude that race contributed to Vernon's use of the peremptory strike.

---

[5] The court allowed each side eight peremptory strikes.

[6] The record also shows Vernon asked to strike juror 30, the third Black juror in the venire. The trial court upheld the State's GR 37 challenge and denied Vernon's peremptory strike. Vernon does not challenge that decision on appeal.

2. Hearsay Evidence

Vernon argues that the trial court erred by excluding as hearsay Akai's testimony that she overheard M.Y. tell him, " 'I never said you raped me, but I said stop and you didn't.' " According to Vernon, the statement was admissible as an excited utterance.[7]

We review a trial court's evidentiary rulings for an abuse of discretion. *Saldivar v. Momah*, 145 Wn. App. 365, 394, 186 P.3d 1117 (2008). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Id.* A decision is "manifestly unreasonable" if it "falls 'outside the range of acceptable choices, given the facts and the applicable legal standard.' " *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013) (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). " '[E]videntiary error is grounds for reversal only if it results in prejudice.' " *Bengtsson v. Sunnyworld Int'l, Inc.*, 14 Wn. App. 2d 91, 99, 469 P.3d 339 (2020) (quoting *City of Seattle v. Pearson*, 192 Wn. App. 802, 817, 369 P.3d 194 (2016)).

"Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is not admissible except as provided by rule or statute. ER 802. Statements made as an excited utterance are one such

---

[7] Vernon also argues for the first time on appeal that the statement was admissible "to complete the picture and offer evidence from others that contradicted M.Y.'s testimony about her own hearsay." Because Vernon did not argue admissibility on that basis below, we do not address the claim on appeal. *See State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988) (citing RAP 2.5(a) giving appellate court discretion to refuse to review any claim of error not raised below).

exception to the hearsay rule. ER 803(a)(2). The proponent of excited utterance evidence must satisfy three closely connected requirements that (1) a startling event occurred, (2) the declarant made the statement while under the stress of excitement of the startling event, and (3) the statement related to the startling event. *State v. Young*, 160 Wn.2d 799, 806, 161 P.3d 967 (2007); ER 803(a)(2).

The excited utterance exception presumes that " 'under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control.' " *State v. Briscoeray*, 95 Wn. App. 167, 173, 974 P.2d 912 (1999) (quoting *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992)). So, often, the key determination is whether the statement "was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001). A delayed statement is not necessarily precluded as an excited utterance if the witness made the statement while still under the continued stress of the incident. *See State v. Thomas*, 150 Wn.2d 821, 854-55, 83 P.3d 970 (2004) (statement made one and a half hours after startling event admissible as excited utterance), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). So, while we look to the time between the startling event and the utterance, we also consider "any other factors that indicate whether the witness had an opportunity to reflect on the event and fabricate a story about it." *Briscoeray*, 95 Wn. App. at 174.

Whether a declarant was still under the influence of an event at the time they made statements about it is a preliminary finding of fact for the trial judge. ER 104(a); *State v. Bache*, 146 Wn. App. 897, 903, 193 P.3d 198 (2008). We review that decision for substantial evidence. *Bache*, 146 Wn. App. at 903. Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the finding's truth. *State v. Stewart*, 12 Wn. App. 2d 236, 240, 457 P.3d 1213 (2020).

Here, the trial court found:

> [Defense] counsel's attempting to bring [M.Y.'s statement] under excited utterance, but you've had two witnesses testify[,] "I came out. [M.Y.] was talking with [Mack]. They were laughing and joking in the kitchen." [Vernon] was getting something at Taco [Bell], then comes back. Where's the excited utterance when this time period goes by? I mean, your witnesses are testifying that there's this jovial conversation happening while somebody else is going off to get food and coming back. That falls completely outside the parameters of excited utterance.

The finding is supported by substantial evidence. Akai and Artisan both testified that they saw M.Y. and Mack laughing together after the rape. And they recalled that at some point, Vernon left to get Taco Bell. After Vernon returned, Mack left, and the witnesses testified that Vernon ate the food while he and M.Y. sat in the living room talking. Akai testified that M.Y. then became "confrontational," and she heard M.Y. say, " 'I never said you raped me, but I said stop and you didn't.' "

Vernon argues that M.Y.'s own testimony shows she was still experiencing stress from the rape at the time she allegedly made the statement. While M.Y. did testify that she was still "shock[ed]" and upset after the encounter with

11

Vernon, the evidence also shows she drove for five blocks before choosing to return to Vernon's house to confront him. In any event, we do not reweigh the evidence on appeal and will uphold the trial court's factual determinations so long as they are supported by substantial evidence. *See State v. Ramos*, 187 Wn.2d 420, 451-53, 387 P.3d 650 ("Although we cannot say that every reasonable judge would necessarily make the same decisions as the court did here, we cannot reweigh the evidence on review," and the trial court did not err in finding substantial and compelling reasons to impose an exceptional sentence downward.), *cert. denied*, 538 U.S. 995, 138 S. Ct. 467, 199 L. Ed. 2d 355 (2017).

The trial court did not abuse its discretion by refusing to admit Akai's hearsay testimony.

3. Jury Instructions

Vernon argues that the trial court provided the jury an inaccurate to-convict instruction. According to Vernon, the instruction's wording left room for the jury to convict him even if it concluded M.Y. initiated sexual intercourse by force. The State argues that Vernon invited any error. We agree with the State.

The invited error doctrine precludes a criminal defendant from seeking appellate review of an error he helped create. *State v. Mercado*, 181 Wn. App. 624, 629-30, 326 P.3d 154 (2014). Under the doctrine, we will not review a party's assertion of error to which the party affirmatively assented, materially contributed, or benefited from at trial. *Id.* at 630. We apply the doctrine when the defendant proposed a jury instruction or agreed to its wording. *State v. Winings*,

126 Wn. App. 75, 89, 107 P.3d 141 (2005). The doctrine applies even to manifest constitutional errors that would otherwise be reviewable for the first time on appeal under RAP 2.5. *State v. Elmore*, 139 Wn.2d 250, 280, 985 P.2d 289 (1999) (citing *State v. Henderson*, 114 Wn.2d 867, 869-70, 792 P.2d 514 (1990)). We apply the invited error doctrine strictly, sometimes with harsh results. *See, e.g.*, *State v. Studd*, 137 Wn.2d 533, 546-47, 973 P.2d 1049 (1999) (even though it was a standard pattern instruction at the time, invited error doctrine prohibited review of legally erroneous jury instruction because defendant proposed it).

Before trial, Vernon proposed the following to-convict jury instruction:

> To convict the defendant of the crime of rape in the second degree, each of the following three elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about September 13, 2018 the defendant engaged in sexual intercourse with [M.Y.];
> (2) That the sexual intercourse occurred by forcible compulsion; and
> (3) That this act occurred in the State of Washington.

The State proposed an identical instruction, and the court agreed to give the instruction to the jury. Vernon now argues that the instruction's passive voice suggested the State needed to prove only that sexual intercourse occurred by forcible compulsion, "whether he was the one who used force or not." And the second degree rape statute requires that the State prove Vernon was the person who used force. *See* RCW 9A.44.050(1)(a) ("A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person . . . [b]y forcible compulsion."). Because Vernon proposed the instruction from which he now complains, his challenge is barred as invited error.

Vernon tries to sidestep the invited error doctrine by reframing the issue as a violation of his due process rights. According to Vernon, he was "convicted of conduct that does not constitute a crime in . . . Washington — having [consensual] sexual intercourse that occurred by forcible compulsion." In support of his argument, Vernon relies on *In re Personal Restraint of Hinton*, 152 Wn.2d 853, 100 P.3d 801 (2004), and *Fiore v. White*, 531 U.S. 225, 121 S. Ct. 712, 148 L. Ed. 2d 629 (2001).

In *Hinton*, our Supreme Court invalidated the petitioners' convictions for second degree murder, determining they were "convicted of crimes under a statute that, as construed in *Andress*, did not criminalize their conduct as second degree felony murder." 152 Wn.2d at 859-60; *see In re Pers. Restraint of Andress*, 147 Wn.2d 602, 615-16, 56 P.3d 981 (2002) (holding assault cannot serve as the predicate crime to convict a defendant of second degree felony murder under former RCW 9A.32.050(1)(b) (1976)). In *Fiore*, the United States Supreme Court held that under the due process clause, a state cannot convict a defendant for conduct that its criminal statute, as later interpreted by the state's highest court, did not prohibit. 531 U.S. at 228-29. The Court noted that under the circumstances in *Fiore*, the State's failure to prove all the elements of the crime beyond a reasonable doubt violated due process. *Id.*

Vernon's reliance on *Hinton* and *Fiore* is misplaced. He does not challenge the sufficiency of the elements of the second degree rape statute. Instead, he argues that the language in his proposed to-convict jury instruction

14

leaves room for the jury to convict him based on facts that do not amount to a crime. Invited error precludes his challenge.

4. Constitutionally of Second Degree Rape Statute

Vernon argues that RCW 9A.44.050(1)(b) is unconstitutionally vague and overbroad. We review the constitutionality of a statute de novo. *State v. Watson*, 160 Wn.2d 1, 5, 154 P.3d 909 (2007). We presume a statute is constitutional, and the party challenging a statute has the heavy burden of proving it is unconstitutional beyond a reasonable doubt. *State v. Coria*, 120 Wn.2d 156, 163, 839 P.2d 890 (1992).

A. Vagueness

The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution require that statutes afford citizens a fair warning of prohibited conduct. *State v. Murray*, 190 Wn.2d 727, 736, 416 P.3d 1225 (2018). A party challenging a statute as vague must show that either (1) the statute does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed, or (2) the statute does not provide ascertainable standards of guilt to protect against arbitrary enforcement. *Coria*, 120 Wn.2d at 163.

A statute "is 'void for vagueness if it is framed in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.' " *City of Seattle v. Eze*, 111 Wn.2d 22, 26, 759 P.2d 366 (1988) (quoting *O'Day v. King County*, 109 Wn.2d 796, 810, 749 P.2d 142 (1988)). But a statute is not unconstitutionally vague just because it fails to

15

define some terms. *In re Pers. Restraint of Troupe*, 4 Wn. App. 2d 715, 723, 423 P.3d 878 (2018). We attribute to those terms their plain and ordinary dictionary definitions, looking to the entire enactment's context. *Id.*

Nor do we require "impossible standards of specificity." *Eze*, 111 Wn.2d at 26. That is, "a statute is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct." *Id.* at 27. If persons " 'of ordinary intelligence can understand a penal statute, *notwithstanding some possible areas of disagreement*, it is not wanting in certainty.' " *Id.* (quoting *State v. Maciolek*, 101 Wn.2d 259, 265, 676 P.2d 996 (1984)). For a statute to be unconstitutionally vague, its terms must be so loose and obscure that no one can apply them clearly in any context. *State v. Alphonse*, 147 Wn. App. 891, 907, 197 P.3d 1211 (2008).

Our first step in resolving a vagueness challenge is to determine whether we review the statute facially or as applied to the facts of a particular case. *City of Spokane v. Douglass*, 115 Wn.2d 171, 181-82, 795 P.2d 693 (1990). A defendant whose conduct is clearly prohibited cannot be the one to facially challenge a statute. *State v. Duncalf*, 177 Wn.2d 289, 297, 300 P.3d 352 (2013) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010)). But a defendant challenging a statute that impacts their right to free speech can bring a facial challenge because both the federal and Washington constitutions protect the right to free speech. *State v. Mireles*, 16 Wn. App. 2d 641, 649, 482 P.3d 942 (2021); U.S. CONST. amend. I; WASH.

16

CONST. art. I, § 5. If a statute does not involve First Amendment rights, then we evaluate a vagueness challenge by examining the statute as applied to the particular facts of the case.[8] *Douglass*, 115 Wn.2d at 182.

Vernon brings a facial challenge to the second degree rape statute. Citing several cases that "recognize the importance of a person's ability to make their own decisions regarding private, sexual matters," he argues that the First Amendment protects his "right to use very mild force in a private sexual relationship." But none of the cases cited by Vernon support his argument that the First Amendment protected his conduct here. *See Lawrence v. Texas*, 539 U.S. 558, 578-79, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (right to consensual sexual activity in the home protected under the Fourteenth Amendment's due process clause); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 693-94, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977) (minors' privacy rights in accessing contraceptives constitutionally protected); *Griswold v. Connecticut*, 381 U.S. 479, 480, 484-85, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) (prosecuting physicians for educating married persons about "the means of preventing conception" violates constitutional rights to privacy); *Skinner v. Oklahoma*, 316 U.S. 535, 537-38, 541,

---

[8] Citing two United States Supreme Court cases, Vernon argues this long-standing rule no longer applies to vagueness challenges. *See Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015); *Sessions v. Dimaya*, 584 U.S. 148, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018). But the Ninth Circuit clarified that "*Johnson* and *Dimaya* did not alter the general rule that a defendant whose conduct is clearly prohibited cannot be the one to make a facial vagueness challenge to a statute." *Kashem v. Barr*, 941 F.3d 358, 376 (9th Cir. 2019). And our Supreme Court continues to apply the rule. *See State v. Fraser*, 199 Wn.2d 465, 484, 509 P.3d 282 (2022) (when a "statute does not implicate First Amendment rights, [it] 'must be evaluated in light of the particular facts of each case' ") (quoting *State v. Halstien*, 122 Wn.2d 109, 117, 857 P.2d 270 (1993)).

62 S. Ct. 1110, 86 L. Ed. 1655 (1942) (fundamental right to marriage and procreation protected under equal protection and due process clauses).

Because Vernon cites no persuasive authority that he engaged in conduct protected under the First Amendment, we decline to address his facial challenge to RCW 9A.44.050(1)(b).

Vernon also fails to show that the second degree rape statute is unconstitutional as applied to the facts of his case. RCW 9A.44.050(1)(a) prohibits engaging "in sexual intercourse with another person . . . [b]y forcible compulsion." RCW 9A.44.010(3) defines "forcible compulsion" as "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped."

Vernon argues that RCW 9A.44.010(3) is vague because it focuses on the victim's "level of resistance to mild force." He asserts that he could be "convicted and imprisoned for a highly stigmatizing crime" for engaging in consensual forcible sex without knowing that he had crossed this "subjective" line. But the facts here do not support finding that Vernon engaged in consensual sex.

M.Y. testified that Vernon forced sexual intercourse with her after she clearly told him at least twice that she did "not want to have sex." Despite her refusals, Vernon shoved M.Y. onto the bed, got on top of her, forced her legs over his shoulders, held her hands above her head, and forced sexual intercourse. M.Y. tried to push Vernon away, told him "no" and "stop," kicked at

18

him, and repeated her objections throughout the rape. An ordinary person in Vernon's position would know that M.Y. was resisting sexual intercourse.

Vernon fails to show that RCW 9A.44.050(1)(b) is unconstitutionally vague as applied to the facts of his case.

B. Overbreadth

Vernon argues that the second degree rape statute is overbroad because "it sweeps within it constitutionally protected sexual behavior without a necessity of finding of lack of consent and without a mens rea requirement."

Our overbreadth analysis under article I, section 5 of the Washington Constitution follows that of the First Amendment to the federal constitution. *Mireles*, 16 Wn. App. 2d at 649. A statute is overbroad under the Washington and federal constitutions if it unlawfully prohibits a substantial amount of protected speech. *Id.* In determining whether a statute is overbroad, we first consider whether the statute reaches a substantial amount of constitutionally protected speech. *Id.* If so, we then determine whether the constitution allows regulation of the protected speech. *Id.*

But while the doctrine of overbreadth has been accorded standing because of the " 'chilling effect' " that a statute might have on the right to free speech, the doctrine is not applied in contexts other than those relating to the First Amendment. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 168, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972). As discussed above, Vernon fails to show that the First Amendment protected his conduct. So, we decline to address his overbreadth challenge.

19

5. Community Custody Conditions

Vernon argues that several of his community custody conditions are unconstitutionally vague. We disagree.

As part of any term of community custody, a sentencing court may order an offender to comply with crime-related prohibitions. RCW 9.94A.703(3)(f). A crime-related condition "prohibit[s] conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). We review a trial court's imposition of crime-related conditions of community custody for abuse of discretion. *State v. Irwin*, 191 Wn. App. 644, 656, 364 P.3d 830 (2015). A trial court necessarily abuses its discretion if it imposes an unlawfully vague condition that curtails constitutional rights. *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018).

A community custody condition is unconstitutionally vague if "(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement." *Padilla*, 190 Wn.2d at 677. When considering the meaning of a community custody condition, "the terms are not considered in a 'vacuum,' rather, they are considered in the context in which they are used." *State v. Bahl*, 164 Wn.2d 739, 754, 193 P.3d 678 (2008) (quoting *Douglass*, 115 Wn.2d at 180). " '[I]f persons of ordinary intelligence can understand what the [law] proscribes, notwithstanding some possible areas of

disagreement, the [law] is sufficiently definite.' " *State v. Nguyen*, 191 Wn.2d 671, 679, 425 P.3d 847 (2018)[9] (quoting *Douglass*, 115 Wn.2d at 179).

Here, the trial court ordered that Vernon shall:

4. Within 30 days of release from confinement (or sentencing, if no confinement is ordered) obtain a sexual deviancy evaluation with a State certified therapist approved by your Community Corrections Officer (CCO) and follow all recommendations of the evaluator. . . .
5. Inform the supervising CCO and sexual deviancy treatment provider of any dating relationship. Disclose sex offender status prior to any sexual contact. Sexual contact in a relationship is prohibited until the treatment provider approves of such.

Vernon argues that the condition to "[d]isclose sex offender status prior to any sexual contact" is vague because it does not specify to whom he must disclose. He suggests that it is unclear whether the condition requires him to disclose his sex offender status to his CCO or a sexual partner. But a person of ordinary intelligence would understand that the condition is meant to warn potential partners of the risks he may pose. Vernon's CCO is already aware of Vernon's sex offender status. So, the condition clearly requires Vernon to disclose his sex offender status to persons with whom he intends to engage in sexual contact.

Vernon also argues that the term "sex offender status" is vague. He says it does "not make it clear whether [he] is to disclose his registration status, the conviction, or the nature of the facts that gave rise to the conviction." But the plain language of the condition requires that Vernon disclose his status as a sex offender. A "sex offense" is "[a] felony that is a violation of chapter 9A.44 RCW,"

---

[9] Second and third alterations in original.

which includes rape in the second degree. RCW 9.94A.030(47)(a)(i); RCW 9A.44.050(2). So, a person of ordinary intelligence would understand that "sex offender status" means being a convicted felony sex offender.

Finally, Vernon argues that the language "[s]exual contact in a relationship is prohibited until the treatment provider approves of such" is vague because Vernon may not have a treatment provider. But Vernon's challenge is not ripe for review.

Community custody conditions are ripe for review on direct appeal " 'if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.' " *Bahl*, 164 Wn.2d at 751 (quoting *First United Methodist Church of Seattle v. Hr'g Exam'r for Seattle Landmarks Pres. Bd.*, 129 Wn.2d 238, 255-56, 916 P.2d 374 (1996) (Dolliver, J., dissenting)). "The court must also consider 'the hardship to the parties of withholding court consideration.' " *Id.* (quoting *First United*, 129 Wn.2d at 255). Vernon's challenge requires further factual development—a sexual deviancy evaluation that will determine whether he will have a treatment provider from whom to seek approval. And deferring consideration of Vernon's argument until that time does not create an undue hardship. So, we do not address his challenge to this condition.

In sum, the trial court did not err by granting the State's GR 37 challenge to his peremptory strike of a Black juror, excluding evidence as hearsay, and giving the parties' proposed to-convict jury instruction. And Vernon fails to show that RCW 9A.44.050(1)(d) is unconstitutionally vague or overbroad or that the

trial court's conditions of community custody are unconstitutionally vague.  We affirm.

Brennan, J

WE CONCUR: